NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ROHINI RAMPERSAD,

Plaintiff,

v.

DOW JONES & COMPANY, INC., DIANNE DECARLO, and POOJA VERMA,

Defendants.

Civil Action No. 19-11733 (MAS) (TJB)

MEMORANDUM OPINION

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Dow Jones & Company, Inc. ("Dow Jones"), Dianne DeCarlo ("DeCarlo"), and Pooja Verma's ("Verma") (collectively, "Defendants") Partial Motion to Dismiss Plaintiff Rohini Rampersad's ("Plaintiff") Complaint. (ECF No. 16.) Plaintiff opposed (ECF No. 18), and Defendants replied (ECF No. 21). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court denies Defendants' Partial Motion to Dismiss.

**I.  BACKGROUND**

Plaintiff began working for Dow Jones in 2005. (Second Am. Compl.[1] ("SAC") ¶ 26, ECF No. 25.) Plaintiff moved to Florida in 2007 and continued to work for Dow Jones, first in a

---

[1] The parties agreed that Defendants' Partial Motion to Dismiss should be applied to the SAC. (*See* ECF No. 26.)

"contract project manager role," and later in a permanent position as Senior Technical Sales Support Executive. (*Id.* ¶¶ 28-29.) She performed both roles remotely from her home. (*Id.*) Plaintiff was terminated in 2015, but her termination was rescinded later that year, and she was assigned a position within the company in which she reported to Dow Jones's Director of Partners and Alliance, Jason Malatesta ("Malatesta"), who was based in Dow Jones's Princeton, New Jersey office. (*Id.* ¶¶ 31-32.)

Plaintiff began suffering from herniated disks in 2017. (*Id.* ¶ 39.) She went out on short-term disability and Family Medical Leave Act ("FMLA") leave from July 3 through August 21, 2017 to undergo surgery. (*Id.* ¶ 43.) Prior to her return to work, Malatesta informed Plaintiff that she would be a part of the Professional Information Business Customer Service Department in Princeton, New Jersey, and would report to DeCarlo, the Department's director. (*Id.* ¶¶ 48-49.) Plaintiff, a 50-year-old woman, was assigned to the Identity and Access Support ("IAS") Team. (*Id.* ¶ 52.) In November 2017, DeCarlo hired two employees for the IAS team who were both "in their early 30s." (*Id.* ¶ 54.) From December 28, 2017 through February 8, 2018, Plaintiff went on short-term disability and partial FMLA leave to undergo neck surgery. (*Id.* ¶ 58.) Upon her return to work, Plaintiff continued to train her colleagues. (*Id.* ¶¶ 59, 62.) Plaintiff learned that Dow Jones had created a job posting for a supervisor position in her department but was discouraged from applying because the position could not be performed remotely. (*Id.* ¶¶ 63-64.) Plaintiff was "shocked" when she learned that Verma would be her new supervisor effective October 2018. (*Id.* ¶¶ 65-66.) Plaintiff took short-term disability and FMLA leave from November 5 through November 23, 2018 to undergo surgery for a hand infection. (*Id.* ¶¶ 67-68.)

On February 14, 2019,[2] Plaintiff was invited to a virtual meeting with DeCarlo and Sarah Goodman, a "People Specialist" at Dow Jones. (*Id.* ¶ 75.) At this meeting, she was informed that her "work-at-home" position in Florida was being converted into an "in-office" position at Dow Jones's Princeton, New Jersey office and that she would be terminated with severance in thirty days unless she chose to relocate to New Jersey. (*Id.* ¶ 76.) Dow Jones relayed that it would no longer pay her $15,000 annual incentive compensation, nor would it pay for her relocation costs if she chose to relocate to New Jersey. (*Id.* ¶ 78.) Six days later, Plaintiff informed Dow Jones that she would not relocate. (*Id.* ¶ 81.) Plaintiff alleges that after she was told that her work-at-home status was ending, Verma's behavior as her supervisor became incessantly demanding. (*See generally id.* ¶¶ 82-89.) Plaintiff was placed on non-working leave from March 4, 2019, through March 31, 2019, and ultimately relieved of her duties. (*Id.* ¶ 94.)

On October 28, 2019, Plaintiff filed a SAC, asserting two claims: retaliation and/or interference in violation of the FMLA against Dow Jones and DeCarlo (*id.* ¶¶ 96-101), and discrimination in violation of the NJLAD, ADA, and ADEA against all Defendants (*id.* ¶¶ 102-08).

## II.  LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for

---

[2] Plaintiff alleges that the virtual meeting occurred on February 14, 2018, both in her SAC (SAC ¶ 75), and in her Opposition Brief (Opp'n Br. at 5, ECF No. 18). Defendants, however, assert that the virtual meeting occurred on February 14, 2019. (Answer ¶ 75, ECF No. 29.) The Court finds that the 2018 date was most likely a typographical error because both parties acknowledge that the events leading up to Plaintiff's termination, such as Plaintiff informing Dow Jones she would not relocate, occurred in 2019. (SAC ¶ 81; Answer ¶ 81.)

3

failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must "'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must "review[] the complaint to strike conclusory allegations." *Id.* The court must accept as true the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).

When deciding a question of state law, this Court is "bound to follow state law as announced by the highest court." *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 361 (3d Cir. 2007). When a state's high court has not answered that question, this Court "can garner assistance from the decisions of the state's intermediate appellate courts in predicting how the state's high court would rule." *Id.* (quoting *Mosley v. Wilson*, 102 F.3d 85, 92 (3d Cir. 1996)). State intermediate appellate court decisions, although not controlling, should be "attributed some weight," and should not be "disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (internal citations and quotations omitted).

## III. DISCUSSION

Defendants argue that the NJLAD does not offer Plaintiff protection because she was "not employed in New Jersey." (Defs.' Moving Br. 9, ECF No. 16-1.) In their Moving Brief, Defendants cited for support several cases decided from 1989 through 2018 by the U.S. District Court for the District of New Jersey, the U.S. Court of Appeals for the Third Circuit, and the New Jersey Superior Court, Appellate Division ("Appellate Division"). (*See generally* Defs.' Moving Br.) A day after Defendants filed this motion, however, the Appellate Division issued *Calabotta v. Phibro Animal Health Corp.*, 213 A.3d 210 (N.J. Super. Ct. App. Div. 2019), a precedential opinion that held, as a matter of first impression, that the NJLAD could apply to a non-resident who works remotely for a New Jersey employer. Defendants advanced two arguments in their Reply Brief urging this Court to decline to apply *Calabotta* here: (1) this Court is not compelled to follow *Calabotta* because the New Jersey Supreme Court has not applied the NJLAD to a non-New Jersey resident and would be unlikely to adopt *Calabotta*'s reasoning; and (2) Plaintiff could not maintain a claim under the NJLAD because the facts of Plaintiff's case are distinguishable from *Calabotta*. (Defs.' Reply Br. 3-9.)

The *Calabotta* plaintiff was an Illinois resident and an employee of an Illinois subsidiary of a New Jersey corporation. 213 A.3d at 214. After he was informed that the corporation was downsizing and his responsibilities would be diminished, the plaintiff sought a new position in the New Jersey offices of the corporation. *Id.* at 215. When the plaintiff was passed over for promotion and later terminated by the corporation, he brought NJLAD claims in which he alleged that the corporation and two supervisors discriminated against him "on account of his association with [his wife,] a person with a disability," in failing to consider him for the promotion and subsequently terminating his employment. *Id.* at 216.

The *Calabotta* court first determined that the text and legislative history of the NJLAD evinced "no expression of legislative intent to limit the statute's protections to job applicants who live in New Jersey, or to those employees who perform all of their employment functions in New Jersey." *Id.* at 224. The NJLAD prohibits a wide variety of discriminatory conduct in the workplace, and New Jersey state courts have repeatedly applied "special rules of interpretation" because of the NJLAD's "broad public policy goals." *Id.* at 222 (quoting *Nini v. Mercer Cty. Cmty. Coll.*, 995 A.2d 1094, 1100 (N.J. 2010); *Smith v. Millville Rescue Squad*, 139 A.3d 1 (N.J. 2016)). As such, the NJLAD must be "liberally construed" to achieve its intended effect of "eradicat[ing] the cancer of discrimination[,] protect[ing] employees, and deter[ring] employers from engaging in discriminatory practices." *Id.* (citations omitted) (second alteration in original).

This Court finds *Calabotta* instructive as to how the New Jersey Supreme Court would decide the extraterritorial reach of the NJLAD, and Defendants fail to cite any New Jersey Supreme Court authority that suggests it would construe the NJLAD differently. Although the New Jersey Supreme Court has not decided the circumstances under which an out-of-state plaintiff may bring a NJLAD claim, this Court is persuaded that it would adopt *Calabotta*'s reasoning. *See Smith*, 139 A.3d at 11 (urging that the NJLAD should be "liberally construed in order to advance its beneficial purposes (internal quotations omitted)); *Nini*, 995 A.2d at 1100 ("[T]his Court has been scrupulous in its insistence that [the NJLAD] be applied to the full extent of its facial coverage." (quoting *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 958 (N.J. 1999)).

*Calabotta* outlined the choice-of-law analysis to determine whether the NJLAD applies to a particular out-of-state plaintiff's employment discrimination claim. First, a court must ask whether an actual conflict exists between the laws of New Jersey and another state, because if no conflict exists, then the forum state's law applies. *Calabotta*, 213 A.3d at 218 (citing *In re Accutane*

*Litig.*, 194 A.3d 503 (N.J. 2018).) If there is a conflict, then a court must consider whether "New Jersey public policy requires the application of [New Jersey] substantive law . . . regardless of the interest of another state." *Id.* at 219 (quoting *Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., LLC*, 160 A.3d 44, 69 (N.J. Super. Ct. App. Div. 2017)). If no such directive exists, either through "an explicit statutory directive or by a process of interpretation and construction," a court presiding over an employment discrimination claim[3] must apply New Jersey substantive law if New Jersey has the "most significant relationship" to the matter in light of the factors set forth in the Restatement (Second) of Conflict of Laws ("Second Restatement"). *Id.* (citations and internal quotation marks omitted).

Applying the Second Restatement's most-significant-relationship test, the *Calabotta* court held that the plaintiff stated a valid failure-to-promote claim under the NJLAD but remanded his wrongful termination claim for further factfinding on whether New Jersey had the most significant relationship to that issue. *See Calabotta*, 213 A.3d at 230. In applying the most-significant-relationship test to the plaintiff's failure-to-promote claim, the court acknowledged that it was "heavily influenced by the fact that the new position sought by plaintiff and other potential applicants was going to be located in [New Jersey]." *Id.* at 227-28. The court stressed that applying the NJLAD to discrimination for hiring decisions in New Jersey best promotes "certainty, predictability, and uniformity," as "it makes sense to have all applicants [for a position] treated under one set of state laws." *Id.* at 228.

The *Calabotta* court was unable to determine whether New Jersey had the most significant relationship to the plaintiff's wrongful termination claim without further development of the

---

[3] *Calabotta* was premised on the NJLAD claim's likeness to a claim of tortious conduct for choice-of-law analysis purposes, as opposed to a claim of, for example, breach of contract. *See Calabotta*, 213 A.3d at 219 n.5.

7

factual record. *See id.* at 229-30. Unlike the failure-to-promote claim, the court reasoned, the corporation may have reasonably expected Illinois employment law to apply to claims brought by staff of its Illinois office. *Id.* at 229. The court also reasoned that the "place of injury" was more likely to be Illinois and noted that the plaintiff had sought Illinois unemployment benefits after being discharged. *Id.* The court acknowledged, however, that "[m]any other facts and factors may also bear upon the calculus," and a showing that the "company's decision to fire him was made or centered in New Jersey . . . would be a counterweight on the New Jersey side of the scale." *Id.*

As *Calabotta* instructs, to determine whether Plaintiff can bring an NJLAD claim, this Court must apply the Second Restatement's most-significant-relationship test. This is a highly fact-specific inquiry that depends on the weighing of at least eleven factors. The fact-specific nature of the test is demonstrated by the different outcomes the Appellate Division reached in *Calabotta* on the plaintiff's failure-to-promote claim as compared to the wrongful termination claim, where both claims arose out of the same sequence of events. This Court, therefore, cannot determine whether the factors lean toward applying the NJLAD to Plaintiff's wrongful termination claim at this time because, as both parties acknowledge, a more fully developed factual record is necessary to determine whether the *Calabotta* choice-of-law principles justify applying the NJLAD to Plaintiff's claims. (*See* Pl.'s Opp'n Memo 19-20; Defs.' Reply Br. 2 (conceding, if this Court finds *Calabotta* indistinguishable, the necessity of "a further development of the facts, through discovery, as to which state had the most significant relationship with Plaintiff, in order that the decision be made at the summary judgment stage")).

## IV. CONCLUSION

The Court finds that, in light of *Calabotta*, the New Jersey Supreme Court would likely apply the NJLAD to out-of-state plaintiffs in some circumstances. The Court further finds that

8

Defendants have not met their burden of showing that Plaintiff has failed to state an NJLAD claim. The Court, consequently denies Defendants' Partial Motion to Dismiss Plaintiff's Complaint. The Court will enter an order consistent with this Memorandum Opinion.

s/ Michael A. Shipp<br>
**MICHAEL A. SHIPP**<br>
**UNITED STATES DISTRICT JUDGE**

Dated: January 31, 2020